IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 18 CR 495 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| IVAN PARKER | ) | |

**DEFENDANT IVAN PARKER'S MOTION FOR BOND**

"We tell ourselves that pestilence is a mere bogy of the mind, a bad dream that will pass away. But it doesn't always pass away, and from one bad dream to another, it is men who pass away." Albert Camus.

There is no questions that a plague, this COVID-19 pandemic, has arrived at our doorsteps. It is a scourge with no sense of morality; it has come for us all, regardless of the righteousness of our deeds, the viciousness of our sins, or the loftiness of our positions in the community. It has already killed world leaders, priests, shop owners, bus drivers and drug dealers. In response to the ever-increasing number of infections around the world (1.5 Million people as of today) and deaths from COVID-19 in the United States (surpassing 16,000 today)[1], Illinois has a shelter-in-place order effective until April 30, 2020.[2] The aim of such an order is to minimize the spread of the outbreak so as not to overwhelm our fragile hospital system as our neighbors flood into emergency rooms, gasping for air.

---

[1] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 6, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).
[2] Executive Order in Response to COVID-19 (April 6, 2020) https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-18.aspx

1

It has become almost impossible to ignore the cruel utilitarian arithmetic other countries are forced to endure in determining which patients will be placed on ever-more precious ventilators and which will take their last desperate breaths, as they frantically look around for the face of a loved-one who will never be allowed in. These are the realities of Italy, New York, Washington. We, in the Northern District of Illinois, must choose how we will prepare. We are racing against a clock with an unknown deadline, hoping that as the worst of this plague passes over us, we have enough beds, gloves, masks, doctors, and nurses to treat everyone who needs care.

COVID-19 is 5 to 35 times more fatal than the flu,[3] with 1 in 6 infected individuals becoming seriously ill and developing difficulty breathing.[4] World health officials have identified segments of the population that are more likely to suffer the most serious effect of a COVID-19 infection: those over 65 years of age or who have underlying medical conditions including 1) lung disease or asthma, 2) serious heart conditions, 3) conditions leaving someone immunocompromised (e.g. HIV)[5]. Mr. Parker lives with HIV. This vulnerability places him at higher risk for severe illness from COVID-19. Mr. Parker shares two additional risk factors that make him most susceptible to suffering complications from a COVID-19 infection:

---

[3] See Exhibit A (Declaration of Dr. Chris Beyrer, Professor of Epidemiology, Johns Hopkins - ¶5.)
[4] *Q&A on Coronavirus* (COVID-19) WHO (April 9, 2020) bit.ly/WHO-Covid-19-QA
[5] Groups at Higher Risk for Severe Illness CDC (April 9, 2020) *at:* bit.ly/CDC-At-RiskCategories

he is male[6] and he is African American. According to an analysis conducted by the Washington Post, African Americans comprise 32% of the population in Chicago, and yet 67% of the deaths from COVID-19 in Chicago have been African Americans.[7]

As of March 19, 2020, the state of Illinois had 824 open ICU beds, 629 open isolation beds, 4,154 empty surgical beds, and 1429 ventilators.[8] An estimate by Harvard Global Health Institute determined that if 20 percent of the population of Illinois were infected with COVID-19, 411,141 of those individuals would need hospital care, and 88,123 of those individuals would need ICU care[9]. At the time of the estimate, the available ICU beds in the state of Illinois was 1410.[10] While there are plans in place to convert the McCormick Center into a field hospital with an additional 3,500 beds, that number is still far below the estimated 21,160 ICU beds needed in the next 6 months.[11]

---

[6] *All Across the United States, The Coronavirus is Killing More Men Than Women, Data Shows* Washington Post (April 9, 2020) at:
https://www.washingtonpost.com/health/2020/04/04/coronavirus-men/

[7] *The Coronavirus Is Infecting And Killing Black Americans At An Alarmingly High Rate. Washington Post* (April 9, 2020) *at:*
https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true

[8] *Illinois Eyeing Sites For Potential Patient Overflow at Hospital for Corona Virus.* CBS Chicago (April 8, 2020) *at:* https://chicago.cbslocal.com/2020/03/19/illinois-eyeing-sites-for-potential-patient-overflow-at-hospitals-for-coronavirus/

[9] *Hospital Capacity By State*, Harvard Global Health Institute, (April 8, 2020) *at:* https://docs.google.com/spreadsheets/d/1XUVyZF3X_4m72ztFnXZFvDKn5Yys1aKgu2Zmefd7wVo/edit#gid=1576394115

[10] *Id.*

[11] *Id.*

3

The Bureau Of Prisons is not exempt from this pandemic. According to the BOP's numbers, there are currently 253 inmates and 85 staff members who have tested positive for COVID-19[12] although there is some reason to believe this number is underreported by the BOP, as they have stopped testing altogether at the facility that has the highest number of infected inmates.[13] This number does not include the *at least* two staff members at the MCC who have not reported to work

While these numbers may not seem alarming, the following graph illustrates just how rapidly the infection numbers are climbing:



---

[12] Open COVID-19 Tested Positive Cases BOP.gov (April 6, 2020)
https://www.bop.gov/coronavirus/
[13] *Oakdale Federal Prison Stops Testing Inmates with COVID-19* (April 6, 2020)
https://www.wdsu.com/article/oakdale-federal-prison-stops-testing-inmates-with-covid-19-symptoms/31989498#

4

The above graph stops at April 6, 2020 with 196 inmates infected. Just three days later, the BOP is reporting a 29% increase in the number of infected inmates (this number does not include the number of inmates at Oakdale Federal Prison who are no longer being tested after five inmates have already died from COVID-19).

We do not need to speculate about the effects an uncontained spread will have both on the inmates and the community at large. Inmates at Statesville Correctional Center have overwhelmed the closest hospital in the area, Saint Joseph Medical Center.[14] The National Guard is being deployed to assist with medical care for inmates who are infected but don't require hospitalization.[15] Not only are inmates at increased risk at Statesville, but staff are now at increased risk themselves of infecting their own families and 30 additional National Guardsmen and women will be placed into a hot zone in order to help treat infected inmates— an outbreak that could have been mitigated by releasing vulnerable inmates.

There is a method for preventing jails and prisons from becoming petri dishes of infection. Reduce the population inside our jails. This recommendation from Attorney General Barr did not come with the proviso that institutions need wait until the infection arrives at any particular facility. This is a strategy

---

[14] *Illinois Prisoners Sick With COVID-19 "Overwhelm" Joliet Hospital* ABC 7 (April 8, 2020) *at:* https://abc7chicago.com/coronavirus-illinois-chiciago-cases/6064085/
[15] *Illinois National Guard Medics Headed To Statesville As Inmate Coronavirus Cases Rise* Chicago Sun Times (April 8, 2020) *at:* https://chicago.suntimes.com/coronavirus/2020/4/1/21202995/coronavirus-covid-19-illinois-prison-stateville-national-guard-field-hospital

recommended to "combat the dangers that COVID-19 poses to…vulnerable inmates." [16]

As news of the unrelenting spread of this pandemic became apparent, health officials quickly identified jails and prisons as high-risk environments for the spread of COVID-19. Dr. Chris Beyer, Professor of Epidemiology at Johns Hopkins pinpointed several reasons why prisons and "jails are petri dishes" for spread:

- Adhering to social distancing guidelines is "virtually impossible";
- Adhering to proper decontamination of surfaces is "virtually impossible;"
- Inmates have limited access to basic hygiene products;
- There are too many shared spaces, including toilets, showers, and mess halls;
- There is not only a high turnover rate in the inmate population, but also staff mix with inmates and then return to their homes; and
- They are ill-equipped (not only in medical equipment, but also protective gear.[17]

In an attempt to mitigate the potential spread of COVID-19 within its walls, the BOP placed all of its facilities on a 14-day lockdown. For Mr. Parker, that meant that was moved to a new cell with a new cellmate and locked into that cell with an individual of unknown infection status.

---

[16] Attorney General William Barr *Memorandum For Director Of Bureau Of Prisons*
[17] See Exhibit A (Declaration of Dr. Chris Beyrer, Professor of Epidemiology, Johns Hopkins - ¶¶13-15.)

A "Recommendation Strategies for Sheriffs and Jails—COVID-19 Crisis" has been distributed by the American Jail Association, which recommends first and foremost, that jail populations be reduced as quickly as possible.[18] This recommendation is being followed in a number of counties across the country, even in jail populations where no confirmed cases of the virus have been reported:

Los Angeles County (CA) has released 1,700 inmates as a result of the outbreak,[19] San Francisco (CA) has released 26 and Alameda County has released 314 inmates.[20] Alabama has released inmates in Autugua, Elmore and Chilton Counties because of the pandemic.[21] Augusta County (VA) has released inmates,

---

[18] *Recommended Strategies For Sheriffs And Jails To Respond To The Covid-19 Crisis* (March 25, 2020) *at:*
https://www.americanjail.org/files/Deitch--Strategies%20for%20Sheriffs%20and%20Jails%20to%20Respond%20to%20the%20COVID-19%20Crisis--3-20-20--FINAL_rev%20(1).pdf

[19] *1,700 Inmates Released From Los Angeles County In Response To Coronavirus Outbreak* CBS News (March 24, 2020) *at:*
https://www.cbsnews.com/news/inmates-released-los-angeles-county-coronavirus-response-2020-03-24/

[20] *San Francisco Releasing 26 Jail Inmates To Help Stem Coronavirus Spread* CBS SF Bay Area (March 20, 2020) *at:*
https://sanfrancisco.cbslocal.com/2020/03/20/san-francisco-releasing-26-jail-inmates-to-help-stem-coronavirus-spread/

[21] *Coronavirus: County Jail Inmates Ordered Released In Autauga, Elmore, Chilton Counties* Montgomery Advertiser (March 25, 2020) *at:*
https://www.montgomeryadvertiser.com/story/news/crime/2020/03/18/county-jail-inmates-ordered-released-autauga-elmore-chilton-counties/2871087001/

despite having not conducted any testing in the jails.[22] Allegheny County (PA) has released over 200 inmates[23], Hamilton County (OH) has released over 600 inmates[24], Harris County (TX) has released 60 inmates,[25], Travis County (TX)[26], Cook County (IL) and Pima County (AZ) have plans to releases non-violent inmates by the end of the week. [27] New York released 300 inmates from Rikers Island as a result of the outbreak.[28] Cuyahoga County (OH) has released 400 inmates in the

---

[22] *Area jails releasing inmates to prevent COVID-19 outbreak behind bars* ABC 8 News (March 25, 2020) *at:* https://www.wric.com/news/virginia-news/area-jails-releasing-inmates-to-prevent-covid-19-outbreak-behind-bars/,
*No Cases Of COVID-19 In Virginia Prisons, Officials Say — But No Inmates Have Been Tested* NBC 12 News (March 25, 2020) at:
https://www.nbc12.com/2020/03/23/no-cases-covid-virginia-prisons-officials-say-no-inmates-have-been-tested/
[23] *Coronavirus In Pittsburgh: Amid Virus Pandemic, Allegheny County Jail Releases More Than 200 Inmates* CBS Pittsburg (March 25, 2020) *at:*
 https://pittsburgh.cbslocal.com/2020/03/20/allegheny-county-jail-released-inmates/
[24] *Hamilton County Sheriff: Jail Population Declining Due To Coronavirus* Cincinnati Public Radio (March 25, 2020) *at:* https://www.wvxu.org/post/hamilton-county-sheriff-jail-population-declining-due-coronavirus#stream/0
[25] *Sheriff Says Order For Some Releases At Harris County Jail Is Not Enough* Houston Chronicle (March 25, 2020) *at:*
https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-order-release-of-people-arrested-on-15151417.php
[26] *Coronavirus: Travis County Inmates Released Amid Illness Spread* Patch (march 25, 2020) *at:*https://patch.com/texas/downtownaustin/coronavirus-some-inmates-be-released-amid-illness-spread
[27] *Pima County Attorney's Office Plans To Release Non-Violent, Pretrial Inmates To Combat COVID-19 Spread* KOLD News 13 (March 25, 2020) *at:*https://www.kold.com/2020/03/25/pima-county-attorneys-office-plans-release-non-violent-pretrial-inmates-combat-covid-spread/
[28] *New York To Release 300 Nonviolent Rikers Inmates Amid Pandemic* The Hill (March 25, 2020) *at:* https://thehill.com/homenews/state-watch/489372-new-york-to-release-300-nonviolent-rikers-inmates-amid-pandemic

last week as a result of the outbreak.[29] These cited locations are just a handful of counties who are releasing inmates or setting up procedures to release inmates in light of this ongoing national emergency, even in jail populations where no one has tested positive for COVID-19. State and Local government have taken significant steps to prevent the spread of COVID-19—the strategy is to stop the spread, not to treat people once they are sick. The same methodology should be applied here; reduce Mr. Parker's risk of contracting a disease that will affect him more significantly and most assuredly take up hospital space, should he become infected.

A growing number of courts have found that COVID-19 related concerns are a compelling *independent* basis for release under the Bail Reform Act—whether the case be in pretrial proceedings, post-plea and presentence postures, or for violations of supervised release:

| Case Caption | Decision |
| --- | --- |
| U.S. v. Little, 2020 1439979 (S.D.N.Y March 24, 2020) (emphasis in original) | "The circumstances that existed when Jerlaine Little was ordered detained have now changed. There is a pandemic that poses a direct risk to Jerlaine Little due to her present (and future) medical conditions . . . ." |
| U.S. v. Perez, 2020 WL 1329225 (S.D.N.Y. March 19, 2020) | Court grants release under §3142(i) "based on the unique confluence of serious health issues and other risks facing this defendant, including but not limited to the defendant's serious |

---

[29] *Jails Release Prisoners, Fearing Coronavirus Outbreak* The Wall Street Journal (March 25, 2020) *at:* https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600

| | |
|---|---|
| | progressive lung disease . . . that place him at a substantially heightened risk of dangerous complications should [he] contract Covid-19 as compared to most other individuals." |
| U.S. v. Garcha, 2020 WL 1593942 (N.D. Cal. April 1, 2020) | In a pretrial case involving §922(g)(1), the Court granted release under §3142(i), finding the defendant's medical conditions—HIV+, a brain tumor, and a prior pulmonary embolism—warranted release based on Covid-19. |
| U.S. v. Chandler, 2020 WL 1528120 (S.D.N.Y, March 31, 2020) | "The extraordinary burdens imposed by the coronavirus pandemic, in conjunction with Chandler's right to prepare for his defense, certainly constitute a 'compelling reason' that permit this Court to order the temporary release of Chandler pursuant to 18 U.S.C. § 3142(i)." |
| U.S. v. Kennedy, 2020 WL 1493481 (E.D. Mi., March 27, 2020) | "Under any possible interpretation of §3142(i)'s language, current events and Defendant's particular vulnerability to the disease constitute compelling reason for release under §3142(i)." |
| U.S. v. Davis, 20 CR 9 (W.Md. March 30, 2020) | "Davis's continued incarceration poses a greater risk to community safety than his release" |
| U.S. v. Harris 2020 WL 1482342 (D.D.C. March 26, 2020) | "The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed |

| | by Defendant's release to home confinement on these strict conditions" |
|---|---|
| U.S. v. Kennedy 18 CR 201316 (E.D. Mich. March 27, 2020) | "waiting for either Defendant to have a confirmed case of COVID-19, or for there to be a major outbreak in Defendant's facility, would render meaningless this request for release. Such a failure to act could have devastating consequences for Defendant and would create serious medical and security challenges to the existing prison population and the wider community." |

Finally, the MCC has been closed to visits since March XXXX. Attorney phone calls are being scheduled on an extremely limited basis and are available for only 10-minute increments. That last time counsel attempted to schedule a phone call with a client, she was given a date two weeks after the date of her request. The MCC has advised attorneys to speak with their clients via corrlinks, which continues to cost money for inmates. Furthermore, Mr. Parker has had his email privileges revoked, leaving no effective way for counsel to communicate with Mr. Parker.

Mr. Parker waived without prejudice his right to a detention hearing. Even if Mr. Parker is not releasable under the Bail Reform Act's primary assessments, he is still releasable under a wholly separate provision of the Bail Reform Act: §3142(i), which allows for the temporary release of an individual "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for *other compelling reason*." (emphasis added). The separate

11

and distinct provision thus allows the Court to release someone from custody *even if* the Court had previously detained that individual under §3142(g) and/or (f). *See, e.g., United States v. Stephens,* --F.Supp.3d--, 2020 WL 1295155 (S.D.N.Y. March 19, 2020)("Even if the Court were to conclude that changed circumstanced did not compel reconsideration of the Defendant's bond conditions, a sperate statutory ground [§3142(i)] by the Defendant would require his release here."); *see also United States v. Kennedy,* 2020 WL 1493481 (E.D. Mich. March 27, 2020) (also recognizing §3142(i) is an independent basis for release).

With the broad standards of §3142(i), which allow courts to release a person when "necessary for the preparation of the person's defense or for another compelling reason", courts around the country finding that the COVID-19 pandemic is just the type of compelling reason to release people. *See Kennedy,* 2020 WL 1493481 at *4 ("Even if defendant did not have a heightened susceptibility to COVID-19, the public health crisis—and its impact on Defendant's ability to present a defense—nonetheless satisfies §3142(i).").

Mr. Parker fits both grounds of release under §3142(i). His compromised immune system from HIV places him in the group of people that the CDC recognizes as "high risk" and his access to counsel has been significantly impaired by the closure of the MCC, and the complete inability to access counsel.

Any argument the government presents that there are no cases of COVID-19 within the MCC currently is unpersuasive for a number of reasons. Firstly, the very reason that health officials recommend the release of inmates is to decrease

12

the risk that COVID-19 will spread uncontrollably, as "each time a new person is added to the jail, it presents at least some risk to the personnel who operate the facility and to the people incarcerated therein."[30] Secondly, "waiting for either Defendant to have a confirmed case of COVID-19, or for there to be a major outbreak in Defendant's facility…could have devastating consequences for Defendant and would create serious medical and security challenges to the existing prison population *and the wider community.*" *Kennedy*, 2020 WL 1493481 at *5. (emphasis added). Finally, there is no requirement that people begin to fall ill before a compelling reason exists. If preventing the spread of COVID-19 is compelling enough a reason to shut down the "City That Works," then preventing the uncontrollable spread of COVID-19 within the MCC is compelling reason enough to temporarily release Mr. Parker.

## CONCLUSION

Day by day it becomes more apparent that it is only a matter of time before COVID-19 enters the MCC, if it has not done so already. That inevitability becomes very dangerous for Mr. Parker, whose immune system is already compromised because of HIV. Mr. Parker presents the following conditions to mitigate any risks he presents to the community:

---

[30] https://www.law360.com/articles/1260965/attachments/0 at 2.

1. Reside with his aunt, Kina Smith at 1520 S. Drake, 2nd Floor, Chicago, Illinois. Ms. Smith has already been vetted by pretrial services to serve as a third-party custodian.

2. Check in weekly with U.S. Probation (or as directed)

3. Check in weekly with defense counsel (or as directed).

4. Submit to electronic monitoring

5. Submit to home incarceration.

For all of the above stated reasons, Mr. Parker prays that he be released from custody on the above-suggested conditions. If the Court wishes to schedule a hearing on the matter, Counsel had previously discussed with Mr. Parker that she would waive his physical appearance at any such bond hearings, and Mr. Parker consented to having his appearance waived.


Respectfully submitted,

/s/Quinn A. Michaelis

Quinn A. Michaelis
Attorney for IVAN PARKER
73 W. Monroe, Suite # 106
Chicago, Illinois 60601
312-714-6920

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2020, I electronically filed the above

**DEFENDANT IVAN PARKER'S MOTION FOR BOND**

with the Clerk of Court using the CM/ECF system to all listed parties in the case.

Respectfully Submitted on April 9, 2020


By His Attorney,

s/ Quinn A. Michaelis

Quinn A. Michaelis
Attorney for IVAN PARKER